IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| MERRY C. TUCKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 06-G-1307-NW |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**MEMORANDUM OPINION**

The plaintiff, Merry C. Tucker, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Supplemental Security Income (SSI). Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. §405(g).

**STANDARD OF REVIEW**

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." <u>Bloodsworth</u>, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth</u>, at 1239..

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  For the purposes of establishing entitlement to disability benefits, physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R.§ 404.1520(a)-(f).  The Commissioner must determine in sequence:

    (1)    whether the claimant is currently employed;

    (2)    whether he has a severe impairment;

    (3)    whether his impairment meets or equals one listed by the Secretary;

    (4)    whether the claimant can perform his past work; and

    (5)    whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner further bears the burden of showing that such work exists in the national economy in significant numbers. Id.

In the instant case, ALJ Dan Grady determined the plaintiff met the first two tests, but concluded that while she has an impairment or impairments considered "severe," she did not suffer from a listed impairment. The ALJ found the plaintiff able to perform a limited range of sedentary work. [R. 20].

## WHEN THE CLAIMANT HAS MULTIPLE IMPAIRMENTS

When a claimant has multiple impairments they must be considered in combination.

> [A] claim for social security benefits based on disability may lie even though none of the impairments, considered individually, is disabling. In such instances, it is the duty of the administrative law judge to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled.

Bowen v. Heckler, 748 F.2d 629, 635 (11th Cir. 1984).

## THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY

It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that exist in significant numbers withing the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical question that does not take into account all of the claimant's impairments, the Commissioner has not met that burden, and the action should be reversed with instructions that the plaintiff be awarded the benefits claimed. This is so even if no other hypothetical question is posed to the VE. See Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1280 (9th Cir. 1987)(noting that when the burden is on the Commissioner to show the claimant can do other work, the claimant is not obligated to pose hypothetical questions in order to prevail).

## WHEN ADDITIONAL EVIDENCE IS SUBMITTED
## TO THE APPEALS COUNCIL

Claimants are permitted to submit new evidence at each step of the review process, 20 C.F.R. § 404.900(b)("In each step of the review process, you may present any information you feel is helpful to your case. [W]e will consider at each step of the review process any information you present as well as all the information in our records."). The Appeals Council is required to consider the entire record, "including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994).

To be material the proffered evidence must be "relevant and probative so that there is a reasonable possibility that it would change the administrative result." Caulder, at 877. A review of the evidence submitted to the Appeals Council demonstrates that it meets all of the requirements of the regulations for consideration by the Appeals Council. Because the Appeals Council actually considered the evidence, the court will only review whether the Appeals Council committed reversible error in refusing to review the plaintiff's case in light of that evidence. The Regulations require the Appeals council to "review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b).

Moreover, a "district court must consider evidence not submitted to the administrative law judge but considered by the Appeals Council when the court reviews the Commissioner's final decision denying Social Security benefits." Ingram v. Astrue, 496 F.3d 1253, 1258 (11th Cir. 2007). "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." Ingram at 1262.

> In Bowen v. Heckler, the claimant filed evidence in the Appeals Council, which considered the evidence but denied review. 748 F.2d 629 (11th Cir. 1984). We held that "the Appeals Council did not adequately evaluate the additional evidence" and, citing earlier precedents, reasoned that "[w]e have previously been unable to hold that the Secretary's findings were supported by substantial evidence under circumstances such as these." Id. at 634. . . . After quoting sentence four of section 405(g) in full and discussing it at length, we concluded that a reversal of the final decision of the Commissioner was appropriate. We held that "the Appeals Council should have awarded Bowen disability insurance benefits," and we remanded to the district court "for entry of an order . . . that such an award be made." Id. at 637.

Ingram at 1263.

## DISCUSSION

The ALJ found that the plaintiff suffers from "residuals including possible early arthritis of the right knee, status post Staphylococcus aureus[1] infection of the knees

---

[1] "A species [of bacteria] comprising the yellow-pigmented, coagulase-positive pathogenic forms of the genus, causing serious suppurative infections and systemic disease; they produce toxins that cause food poisoning and toxic shock syndrome." Dorland's Illustrated Medical Dictionary 1572 (28th Ed. 1994).

and right shoulder; hepatitis C; and thrombocytopenia[2], impairments that are considered 'severe'. . . ." [R. 19]. However, the ALJ found that the plaintiff's "medically determinable impairments do not meet or medically equal one of the" Listings. [R. 19]. "Although the claimant cannot perform the full range of sedentary work, she can make a vocational adjustment to other jobs existing in significant numbers in the national economy" including final assembler, rotor assembler and semi-conductor assembler. [R. 20]. As such, the ALJ found the plaintiff not disabled. [R. 20].

Following a puncture wound to her right foot after she stepped on a nail, the plaintiff presented to Eliza Coffee Memorial Hospital ("ECMH") on September 9, 2003, complaining of pain and swelling of her right leg and pain and decreased mobility of her right shoulder, and was seen by Ricky L. Irons, M.D. [R. 131]. She was diagnosed with methicillin resistant Staph aureus ("MRSA") bacteriemia, osteomyelitis and septic joints of the right knee and right shoulder due to MRSA, thrombocytopenia, hepatitis C and elevated liver enzymes secondary to her hepatitis. She was hospitalized for more than a month, and received intravenous Vancomycin[3] and Primaxin[4] to fight the MRSA

---

[2] Thrombocytopenia is a "decrease in the number of blood platelets." Dorland's Illustrated Medical Dictionary 1707 (28th Ed. 1994).

[3] "[A]n antibiotic produced by the soil bacillus *Streptomyces orientalis*, which is highly effective against cocci, especially staphylococci, and other gram-positive bacteria, occurring as a tan to brown, free-flowing powder; used in the treatment of severe staphylococcal infections resistant to other antibiotics, administered intravenously or by intravenous infusion." Dorland's Illustrated Medical Dictionary 1794 (28th Ed. 1994).

[4] The trademark name for a preparation of imipenem ("an antibacterial derived
(continued...)

infection. After her discharge on October 13, 2003, the plaintiff was to continue her Vancomycin treatment at home. [R. 132]. On October 15, 2003, a registered nurse from Mid South Home Health ("Mid South") observed that the plaintiff was "homebound due to functional limits and consequently, leaving home requires a taxing effort," and began her home IV treatment of Vancomycin. [R. 435]. Mid South made some 26 home health visits to the plaintiff from October 15, 2003, through January 3, 2004. [R. 321-424]. On October 27, 2003, Dr. Irons referred her for further treatment by John T. Murphy, M.D., of the North Alabama Bone and Joint Clinic, and S. D. Steele, M.D., her physician in Russellville. [R. 290].

However, on November 13, 2003, the plaintiff was readmitted to ECMH because her left knee had developed a Staph infection, similar to her previous right knee infection, and was hospitalized until November 25, 2003, when Dr. Murphy released her to continue her home health Vancomycin treatment. [R. 240-287]. From November 3, 2003, through April, 2005, the plaintiff was treated by Dr. Murphy for pain related to her knee. [R. 297-298; 495-499]. Over the course of his treatment, Dr. Murphy prescribed Naprosyn, Lortab and Darvocet for pain. [Id.]. On April 27, 2005, Dr. Murphy completed a "Continuing Disability Claim Form," in which he opined that the plaintiff's

---

[4] (...continued)
from thienamycin with activity against a wide range of gram-positive and gram-negative organisms") and cilastatin sodium. Dorland's Illustrated Medical Dictionary 821, 1351 (28th Ed. 1994).

degenerative joint disease of the left knee had not improved, and that she had remained disabled, indefinitely, from October 2004. [R. 458].

Meanwhile, in July 2004, the plaintiff presented at Riverbend Center for Mental Health ("Riverbend") complaining of depression "since she got sick in August of 2003." [R. 478]. She complained of anxiety, panic, insomnia, crying spells, and feelings of inadequacy. [R. 485]. She was diagnosed with Major Depressive Disorder, and was scheduled for hourly individual therapy sessions and to be evaluated by David U. Anakwenze, M.D., a Riverbend staff psychiatrist.

On November 15, 2004, Dr. Anakwenze diagnosed Major Depressive Disorder and was to rule out Bipolar II Disorder, and assesed her GAF at 42. [R. 469]. He prescribed Seroquel, Trileptal and Effexor. [R. 469]. Dr. Anakwenze's diagnosis changed in June 2005 to Bipolar II Disorder and was to rule out major depressive disorder with psychotic features. He assessed her GAF at 50. [R. 460]. He described her as anxious, nervous and depressed, with crying spells and fluctuations in mood. [R. 461]. He changed her prescriptions to Ativan, Xyprexa Sydis, Trileptal and Zoloft. [R. 461].

The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 30 (4th Edition) ("DSM-IV"). A GAF of 41-50 indicates: "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32. Several courts of appeal have, in unpublished or nonprecedential

opinions, considered the impact of a claimant's GAF score of 50 or below. The courts generally find that a GAF score of 50 or below is not in and off itself determinative of disability. See Hillman v.Barnhart, 48 Fed Appx. 26, 2002 WL 31260962 at * 3, n.1(3rd Cir. 2002)(not precedential)(noting that a GAF of 50 would indicate a claimant could perform some substantial gainful activity); Rutter v. Comm'r of Soc. Sec., 91 F.3d 144 (Table), 1996 WL 397424 at *2 (6th Cir. 1996)(unpublished opinion)(exclusive reliance on GAF score not appropriate); Roemmick v. Shalala, 59 F.3d 176 (Table), 1995 WL 299894 at *2, n.1 (9th Cir. 1995)(noting that an inability to work is only one example of the level of adaptation meriting a GAF of 40); Seymore v. Apfel, 131 F.3d 152 (Table), 1997 WL 7555386 at *2 (10th Cir. 1997)("Contrary to claimant's contention, a GAF rating of 45 may indicate problems that do not necessarily relate to the ability to hold a job; thus standing alone without further narrative explanation, the rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work."); Stalvey v. Apfel, 242 F.3d 390 (Table), 2001 WL 50747 at *2 (10th Cir. 1999)("The GAF is not an absolute determiner of ability to work."). But cf. Lloyd v. Barnhart, 47 Fed. Appx. 135, 2002 WL 31111988 at *1, n.2 (3rd Cir. 2002)(not precedential)(noting that a vocational expert at the administrative hearing testified that a GAF of 50 or lower would indicate claimant would not be able to keep a job).

At her hearing before ALJ Grady, the plaintiff testified that the only work she had ever done was that of a home health aide. [R. 29, 35]. After describing her foot injury, hospitalization and follow-up treatment, the plaintiff testified that:

> still, my knee still gives me problems. I had to go to Dr. Murphy and he has to give me these cortisone shots. And my leg swells up really big at night. I can stay on, I have a physical therapist come and help for a while. And they told me that they wanted me, Dr. Murphy told me he wanted me to try to walk on it at least a mile a day. I can't do it. It swells up big after I'm on it for three or four hours. I have to elevate it. And sometimes it goes backwards and I've fallen it's documented in doctors reports. I have fallen like four or five times. Sometimes in a month. It goes backwards.
>
> . . . all of a sudden, when it goes back, it's a sharp pain and it almost makes me feel like I need to pass out. And four weeks ago I did pass out.

[R. 31]. As for her mental state, the plaintiff testified:

> And from doing the home health care all my life, it just really upsets me that I can't do that any more. And I just, I lose my temper sometimes and I don't mean to. And I just scream and yell. And that's why me and my husband that I married a couple of years ago aren't together. He said he couldn't deal with it any more. And they recommended, Dr. Murphy and Dr. Steele, recommended that I go to Riverbend. So I started going and they've tried me on a couple of different medications and they think they've found one that helps some. They might have to adjust it. And I just find myself nervous and crying a lot. Not sleeping too well. I'll sleep like about maybe three hours a night even with the sleeping medicine he gives me. And then during the day I'll fall asleep. And then I'll sleep, like I said, like three or four hours at a time. That's pretty much how my day goes.

[R. 32]. The plaintiff testified that her daily activities include sitting, watching television while elevating her leg, occasionally shopping for small grocery items, light housework, listening to music and sleeping three to four hours. [R. 32-42].

In his decision, the ALJ found:

> Although the claimant has also been diagnosed with bipolar disorder and migraine headaches, the undersigned finds that the record shows that these conditions are controlled and do not result in work-related limitations. Therefore, these are not "severe" impairments as defined by the Regulations.

[R. 16]. This conclusion is not supported by substantial evidence. Although it is not clear whether the ALJ had the benefit of Dr. Anakwenze's written reports, the ALJ was made aware of these records at the hearing:

> ATTY: Your Honor, I did fail to mention this. There were, in the Riverbend records, she did have a GAF score of 42 in November, and 50 in June of '05.
>
> ALJ: All right.
>
> ATTY: And just, that's the only time I think they really showed a GAF score from those two standpoints.
>
> ALJ: Well --
>
> ATTY: And I think there was --
>
> ALJ: Don't take my failure to rule from the bench --
>
> ATTY: Oh, right, right, right, exactly.
>
> ALJ: – as, as [INAUDIBLE]. I need to research the point.
>
> ATTY: Sure.
>
> ALJ: It's possible she meets the listing.

[R. 45]. In any event, the Appeals Council was given the further benefit of Dr. Anakwenze's August 12, 2005, assessment that the plaintiff's Bipolar II Disorder could reasonably be expected to be disabling. [R. 541].

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d at 1229.  At the hearing, the ALJ failed to consider the plaintiff's bipolar disorder in his hypothetical to the VE.:

> ALJ:     No commercial driving, no moving machinery, no open heights, no stairs and ramps or ladders and other climbing devices.  No more than occasional on all the other posturals [sic].  No push/pull with the lower extremeties.  ***There are allegations of mental disorders, but she seems to be reasonably intelligent.  At this point I think we mark that as no significant mental limitations.***  With that hypothetical, sir, could she perform her past relevant work?

[R. 43-44].(emphasis added).  Although the VE found that there were some jobs that the plaintiff could perform, the ALJ never asked a hypothetical question which included the plaintiff's mental impairments.  Moreover, the emphasized language above is a *non sequitur*.  At best, ALJ Grady is exhibiting a lack of understanding of bipolar disorder.  At worst, the ALJ seems to have already determined that the plaintiff's mental disorder would not be considered in deciding her case.

In denying the plaintiff's request for review, the Appeals Council "considered . . . the additional evidence" and "found no reason under [its] rules to review" the ALJ's decision.  [R. 5].  In light of this additional evidence, the Appeals Council committed reversible error in failing to either review the plaintiff's case or to remand it for further proceedings.

**CONCLUSION**

This is a case where "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). In such a case the action should be reversed and remanded with instructions that the plaintiff be awarded the benefits claimed. Id. Therefore, the plaintiff is disabled within the meaning of the Social Security Act. An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

DONE and ORDERED 17 January 2008.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.